# IN THE UNITED STATES DISTRICT COURT
# FOR THE MIDDLE DISTRICT OF TENNESSEE
# NASHVILLE DIVISION

THE METROPOLITAN GOVERNMENT
OF NASHVILLE AND DAVIDSON
COUNTY, TENNESSEE and the
METROPOLITAN NASHVILLE AIRPORT
AUTHORITY,

      Plaintiffs,

v.

BILL LEE, in his official capacity as
Governor of the State of Tennessee; RANDY
McNALLY, in his official capacity as
Speaker of the Senate of the State of
Tennessee; and CAMERON SEXTON, in his
official capacity as Speaker of the House of
Representatives of the State of Tennessee,

      Defendants.

Case No.: _____

## COMPLAINT

Plaintiffs Metropolitan Government of Nashville and Davidson County ("Metro Nashville") and the Metropolitan Nashville Airport Authority ("MNAA") seek declaratory and injunctive relief from implementation of 2026 Tennessee Public Acts Chapter 978 (hereinafter, the "2026 Act"), which Defendant Governor Bill Lee signed into law on May 19, 2026. The Act fundamentally changes the structure and control of the Metropolitan Nashville Airport Authority ("MNAA") by vacating the MNAA's current board of commissioners, removing the power of Metro Nashville's Mayor and Council to jointly appoint and confirm those commissioners, and giving majority appointment and removal power (and thus control) to Governor Lee and Defendants Speaker of the Senate Randy McNally and Speaker of the House Cameron Sexton

("State Officer Defendants"). Because both Metro Nashville and MNAA (collectively "Plaintiffs") object to this takeover, federal law imposes a clear sequential framework to ensure the resolution of this dispute and an independent review by the Administrator of the Federal Aviation Administration ("FAA") before implementing the change. *See* Federal Aviation Administration Reauthorization Act of 2024, Pub. L. 118-63, § 757, 138 Stat 1025, 1285-87 (2024) ("Section 757"). Accordingly, this Court should enjoin State Defendants' effort to bypass Section 757 and implement a reconstituted airport authority on July 1, 2026, pursuant to the 2026 Act.

In support of its requests for a declaratory judgment and temporary and permanent injunctive relief, Metro Nashville and MNAA respectfully allege as follows:

## JURISDICTION AND VENUE

1. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331.

2. This Court has authority to issue a declaratory judgment pursuant to 28 U.S.C. § 2201.

3. Venue is proper in the Middle District of Tennessee pursuant to 28 U.S.C. § 1391, as this cause of action arose in Davidson County, Tennessee.

## PARTIES

4. Plaintiff Metro Nashville is a consolidated city and county government formed by the City of Nashville and Davidson County pursuant to Tenn. Code Ann. §§ 7-1-101, *et seq.* Metro Nashville is the creating municipality of MNAA pursuant to the Metropolitan Airport Authority Act. *See* Tenn. Code Ann. §§ 42-4-101 *et seq.*

5. Plaintiff MNAA is a public and governmental body acting as an agency and instrumentality of Metro Nashville. *Id.* § 42-4-102(a). MNAA was created by Metro Nashville in

1970 pursuant to the Metropolitan Airport Authority Act. MNAA is recognized by the FAA as the airport sponsor of record for Nashville International Airport ("BNA").

6. Defendant Bill Lee is the Governor of the State of Tennessee. The Tennessee Constitution vests the Governor with "[t]he supreme executive power of this State." Tenn. Const. art. III, § 1. As the Chief Executive for the State of Tennessee, Governor Lee has a constitutional obligation to "take care that the laws be faithfully executed." *Id*. § 10. Governor Lee is sued in his official capacity and may be served through the Tennessee Attorney General and Reporter's Office.

7. Defendant Randy McNally is the Speaker of the Senate of the General Assembly of Tennessee pursuant to Article II, Section 3 of the Tennessee Constitution. Speaker McNally is sued in his official capacity and may be served through the Tennessee Attorney General and Reporter's Office.

8. Defendant Cameron Sexton is the Speaker of the House of Representatives of the General Assembly of Tennessee pursuant to Article II, Section 3 of the Tennessee Constitution. Speaker Sexton is sued in his official capacity and may be served through the Tennessee Attorney General and Reporter's Office.

<u>**FACTUAL ALLEGATIONS**</u>

**I. Federal Administration of Air Travel and Airports.**

1. The FAA, which is authorized as an administration within the United States Department of Transportation, 49 U.S.C. § 106, is charged with maintaining and improving the safety and security in air travel, controlling the use of navigable air space, and "encourage[ing] the development of civil aeronautics," *id.* § 40104(d).

2. The federal government's promotion of civil aeronautics and safe air travel dates to the adoption of the Air Mail Act of 1925 and the Air Commerce Act of 1926. Initially, authority

3

for promotion of safe and efficient civil aeronautics system was entrusted to the Department of Commerce's Aeronautics Branch, which was renamed the Bureau of Air Commerce in 1934. The Bureau assumed responsibility for the first air traffic control centers in 1936. The Civil Aeronautics Act of 1938 established comprehensive federal economic and safety regulation of air travel. In 1958, an independent Federal Aviation Agency assumed existing responsibilities for regulating and supporting civilian air travel, and that agency was renamed the Federal Aviation Administration in 1967 when it was incorporated into the United States Department of Transportation. *See generally* FAA, *A Brief History of the FAA*, (Nov. 15, 2021), https://www.faa.gov/about/history/brief_history.

3. The federal government's direct financial support for development of a national network of civilian airports began with the Federal Airport Act of 1946, Pub. L. 79-377; *see also* Congressional Research Service, Report No. R43327, *Financing Airport Improvements*, at 1 (updated March 15, 2019) ("A federal role in airport infrastructure first developed during World War II. Prior to the war, airports were a local or private responsibility, with federal support limited to the tax exclusion of municipal bond interest.").

4. The Federal Airport Act established the Federal-Aid Airport Program ("FAAP"), which predominantly funded airports through a funding formula based on each state's population and geographic area. *See* Pub. L. 79-377, ch. 251, 60 Stat. 170. Although the program apportioned funds among the States by formula, the resulting grants were made directly to the public agencies that owned and operated airports.

5. The Federal Airport Act was succeeded by the Airport and Airway Development Act of 1970 ("AADA"), Pub. L. 91-258, which established the Air Development Aid Program ("ADAP") and the Planning Grant Program ("PGP"). These programs routed federal funding for airports through airport sponsors based on each airport's actual air traffic.

4

6. The 1970 AADA also established the FAA's authority to mandate minimum safety standards enforced through a formal certification process. To ensure safety in air transportation, the FAA must issue an "airport operating certificate" to any person or entity desiring to operate an airport. *See* 49 U.S.C. § 44706.

7. The AADA was succeeded by the Airport and Airway Improvement Act of 1982, Pub. L. No. 97-248, which established the Airport Improvement Program ("AIP"), through which the FAA continues to provide federal grants supporting the development of airport infrastructure. *See generally* 49 U.S.C. ch. 471.

8. Recipients of AIP grants are described as "sponsors" in the FAA Act. *See* 49 U.S.C. § 47102(26). An airport sponsor includes any public agency that "has received financial assistance for airport development or planning under the Federal Airport Act, Airport and Airway Development Act or Airport and Airway Improvement Act" as well as "[a]ny person to whom the Federal Government has conveyed property for airport purposes under section 13(g) of the Surplus Property Act of 1944, as amended." 16 C.F.R. § 16.3*; see also* 14 C.F.R. § 152.103.

9. Federal airport development funds are provided directly to the public agency that owns and operates each airport—its sponsor—rather than channeled through state governments or funding intermediaries. Compliance with federal obligations accompanying these grants attaches to the sponsor as well.

10. Prior to approving AIP grants, the FAA must confirm *inter alia* that either the sponsor, a public agency, or the Government holds good title to the airport, that "the interests of the community in or near which the project may be located have been given fair consideration," and that the application provides for infrastructure deemed "necessary for safe and efficient use of the airport by aircraft." *See* 49 U.S.C. § 47106.

11. As a condition of every airport development grant, the airport sponsor must execute a written grant agreement, which includes a set of mandatory grant assurances by which the airport sponsor commits to continuing federal obligations governing the ownership, operation, control, and use of the airport. *See* 49 U.S.C. § 47107. Each assurance is derived from federal statute and incorporates additional federal statutes, regulations, and policies by reference. These grant assurances bind the sponsor for the useful life of the facilities developed with federal funds. To be eligible for grant funding, any sponsor of a federally obligated airport must have complied with its obligations under prior airport development grants and its covenants in federal conveyances. 14 C.F.R. § 152.103.

12. Under these Grant Assurances, airport sponsors are obligated to preserve their rights and powers. AIP Grant Assurance 5(a), amended in 90 FR 17501, available at https://www.faa.gov/airports/aip/grant_assurances/assurances-airport-sponsors2025. Pursuant to this assurance, airport sponsors must "not take or permit any action which would operate to deprive it of any of the rights and powers necessary to perform any or all of the terms, conditions, and assurances in this Grant Agreement without the written approval of the Secretary, and will act promptly to acquire, extinguish or modify any outstanding rights or claims of right of others which would interfere with such performance by the sponsor." *Id.*

13. Because the FAA must issue an "airport operating certificate" to each person and entity operating a civilian airport and compel compliance by airport sponsors with ongoing federal obligations pursuant to federal grant assurances and land conveyances, the FAA has developed policies related to changes in airport sponsorship, ownership, governance, or operational responsibility. *See* FAA, Notice of Policy on Evaluating Disputed Changes of Sponsorship at Federally Obligated Airports, 81 Fed. Reg. 36144 (June 6, 2016); Fed. Aviation Admin.,

6

Compliance Guidance Letter 2021-1: Guidance for Transfer of Federally Obligated Airports (July 28, 2021); FAA Reauthorization Act of 2024, Pub. L. No. 118-63 § 757 (2024).

## II.      The Metropolitan Airport Authority Act and Nashville's Airport.

14.      The City of Nashville acquired land and constructed McConnell Field, its first publicly funded airport, in 1928 to link Nashville to the national airmail network. This airport could not safely accommodate the longer runways necessitated by the larger airplanes made possible by technological advances in aviation.[1]

15.      In 1935, the City of Nashville's Mayor appointed a committee to identify a site for a municipal airport. After acquiring four farms outside its municipal boundaries, the City began construction in partnership with the Works Progress Administration, which was administered by Colonel Harry S. Berry. Berry Field Nashville Airport ("BNA" or "Berry Field" or the "Airport") opened in 1937.

16.      After the commencement of World War II, the United States took possession of Berry Field to aid in the nation's war efforts. Following the war, the United States reconveyed Berry Field to the City of Nashville through an Instrument of Transfer pursuant to the Surplus Property Act of 1944.

---

[1] MNAA, Master Plan Update, at I-6–I-8 (2020); *see generally* Georgiana T. McConnell, "A Chronology of Nashville Airports," *Nashville Historical Newsletter* (Oct. 11, 2021) *available at* https://nashvillehistoricalnewsletter.com/2021/10/11/a-chronology-of-nashville-airports/?cs=0&hl=en-US&biw=1707.3333740234375&bih=898 [https://perma.cc/BSV6-5WSG]; *see also* The Historical Commission of Metropolitan Nashville and Davidson County, "McConnell Field Historical Marker," *available at* https://www.hmdb.org/m.asp?m=147168; Tennessee Air National Guard, 118th Air Wing, "The Old Hickory Squadron," *available at* https://www.118wg.ang.af.mil/About-Us/Fact-Sheets/Display/Article/439188/the-old-hickory-squadron/ [https://perma.cc/2QH3-2MDM].

17.    In the Instrument of Transfer executed between the federal government and the City of Nashville, the federal government retained a reversionary interest in the conveyance and imposed numerous obligations on the City of Nashville through the conveyance. *See* 49 U.S.C. § 47152(8) (providing that when any term of the conveyance is not met, "any part of the interest in the property reverts to the Government, at the option of the Government, as the property then exists.")

18.    The City of Nashville continued to own, operate, and make improvements to BNA in its capacity as a municipal corporation through 1962.

19.    Metro Nashville was established in 1962 through the consolidation of the City of Nashville and Davidson County after its citizens adopted the Charter of the Metropolitan Government of Nashville and Davidson County ("Metro Charter"). As a public corporation, Metro Nashville succeeded to ownership of all property held by the City of Nashville in its proprietary capacity, including BNA. *See* Tenn. Code Ann. § 7-3-101 ("Any metropolitan government created and established pursuant to chapters 1–3 of this title shall acquire and succeed to all rights, obligations, duties and privileges of the county and of the cities consolidating; and, without the necessity or formality of deed, bill of sale or other instrument of transfer, the metropolitan government shall be and become the owner of all property previously belonging to the county and cities.").

20.    The Metro Charter established a Department of Aviation and made it responsible "for the operation, maintenance and control of the Nashville Metropolitan Airports and other airports owned or operated" by Metro Nashville. *See* Metro Nashville Charter §§ 8.701, 8.702. The Metro Charter also empowered the mayor to appoint the director of aviation. *Id.* § 8.703.

Metro Nashville managed the airport directly through its Department of Aviation until MNAA was created in 1970.

21. In 1969, the 86th Tennessee General Assembly passed the Metropolitan Airport Authority Act. *See* 1969 Public Acts ch. 174. An accurate and authentic copy of the Act is attached as <u>Exhibit 1</u>. The Metropolitan Airport Authority Act is codified at Tenn. Code Ann. §§ 42-4-101, *et seq.*

22. The Metropolitan Airport Authority Act's "Declaration of Purpose" states that the Act was intended to give "local governments in metropolitan regions … the option of placing the control, operation and financing of metropolitan airports in regional and metropolitan instrumentalities." 1969 Public Acts ch. 174, § 2. The Act did this by giving local government sole discretion to create a metropolitan airport authority and full control over appointments to the authority's board of commissioners.

23. The Metropolitan Airport Authority Act further recognized the close relationship between metropolitan airport authorities and the local governments that created them by recognizing the authorities as "agencies and instrumentalities of the creating and participating municipalities," not agencies of the State. Tenn. Code Ann. § 42-4-402(a).

24. The Metropolitan Airport Authority Act limited its grant of authority to a class of local governments consisting of cities and metropolitan governments with a population of at least 100,000. Tenn. Code Ann. § 42-4-103(6) (defining "creating municipality"); *id*. § 42-4-104(a) (authorizing cities and metropolitan governments having population not less than 100,000, or any county including such city, to create a metropolitan airport authority).

25. Municipalities of this size were granted this authority because they share the same challenges: "the present and projected rapid growth in air traffic, the need for adequate terminal

9

facilities in the metropolitan regions of the state, the need to eliminate airport hazards without regard to municipal and county boundaries, and the need to raise large amounts of capital without further burdening the taxpayers in such regions." 1969 Public Acts ch. 174, § 2.

26. A qualifying municipality creates a metropolitan airport authority by taking the following steps: (a) the municipality's governing body, with approval of the executive officer, adopts a resolution calling a public hearing on the question of creating an authority; (b) the governing body conducts a public hearing; and (c) the governing body determines that public convenience and necessity requires creation of an authority and, with approval of the executive officer, adopts a resolution creating the authority. Tenn. Code Ann. § 42-4-104(b), (c).

27. After creating the authority, the creating municipality must enter into an agreement with the authority for the orderly transfer of the municipality's airport properties, functions, and outstanding obligations to the authority. *Id*. § 42-4-104(d).

28. The four largest cities in Tennessee—Metro Nashville, Knoxville, Chattanooga, and Memphis—each exercised the option to create airport authorities.

29. In 1970, Metro Nashville formed the MNAA pursuant to the Metropolitan Airport Authority Act to replace the City Aviation Department. *See* Res. 70-872, A Resolution Creating the Metropolitan Airport Authority of Nashville and Davidson County, Metropolitan Government of Nashville and Davidson County (Feb. 3, 1970) (copy attached as Exhibit 2).

30. The governing body of the MNAA is a board of commissioners consisting of seven persons appointed by Metro Nashville's Mayor and approved by Metro Nashville's Metropolitan Council. Tenn. Code Ann. § 42-4-105(a)(1)(A) (2022). A member of the board of commissioners can only be removed for cause by a two-thirds vote of the Metro Council after being granted an opportunity for a public hearing. *Id*. § 42-4-105(d)(4).

10

31. Each member of the MNAA's board of commissioners serves a seven-year term. *Id*. § 42-4-105(d)(1)(A).

32. MNAA is a public and governmental body acting as an agency and instrumentality of Metro Nashville. *Id*. § 42-4-102(a); *see also* Tenn. Op. Att'y Gen. No. 01-167, 2001 WL 1628001, at *5 (Nov. 20, 2001) ("Thus, while the MNAA may have been created to operate independently, it is still an agency of Metro . . . ."). MNAA is subject to audit oversight by Metro Nashville. *See* Tenn. Op. Att'y Gen. No. 01-167, 2001 WL 1628001, at *5 (MNAA "is still subject to audit oversight by Metro Government").

33. The Metropolitan Airport Authority Act has been amended several times since 1970. *See, e.g.*, 2002 Public Acts ch. 562, at § 2. But the legislation's essential structure, including the longstanding commissioner-selection process and authority of Metro Nashville to remove commissioners for cause, did not change until 2023.

34. Pursuant to the Metropolitan Airport Authority Act, Metro Nashville retains the sole authority to determine the continuation or dissolution of MNAA, and upon dissolution "title to all funds and other properties of the authority at the time of the dissolution shall vest in and be delivered" to Metro Nashville as the creating municipality. *See* Tenn. Code Ann. § 42-4-113(b).

35. Under Tennessee law, the State has the authority to establish and operate airports through the Tennessee Department of Transportation. *See id.* § 42-2-204(a)(1).

36. Under Tennessee law, TDOT may "acquire existing airports and air navigation facilities, provided, that it shall not acquire or take over any airport, air navigation facility, avigation easement or easement in airport hazards owned or controlled by a municipality of this or any other state without the consent of the municipality." *Id.* § 42-2-204(a)(3).

11

### III.  The FAA Reauthorization Act of 2024.

37.  The FAA Reauthorization Act of 2024 (the "Reauthorization Act") was signed into law on May 16, 2024. FAA Reauthorization Act of 2024, Pub. L. No. 118-63, 138 Stat. 1025 (2024). According to the FAA, "[t]his authorization runs through Fiscal Year 2028 and communicates congressional priorities for how the agency carries out its mission to provide the safest, most efficient aerospace system in the world. This legislation is broad and speaks to everything from FAA's organizational structure, ways to bolster many of the agency's oversight processes, and where to invest resources to support safety and efficiency for both conventional users and new entrants.  Much of this legislation aligns with the agency's existing priorities and approaches but tells us where Congress is most interested in seeing adjustments to resources and timelines for various activities." FAA, *FAA Reauthorization*, (Oct. 30, 2024) https://www.faa.gov/about/reauthorization [https://perma.cc/5YU4-6BBJ].

38.  Section 757 of the Reauthorization Act, Pub. L. No. 118-63 § 757, 138 Stat 1025, 1285–87 (2024), superseded the FAA's Notice of Policy on Evaluating Disputed Changes of Sponsorship at Federally Obligated Airports, 81 Fed. Reg. 36144 (June 6, 2016) (the "2016 FAA Policy"). Section 757 of the 2024 Reauthorization Act is attached hereto as Exhibit 3. A copy of the 2016 FAA Policy is attached as Exhibit 4.

39.  The 2016 FAA Policy was adopted after attempted state takeovers of urban airports by the North Carolina legislature in 2013 and the Mississippi legislature in 2016.

   a.  In 2013, the North Carolina General Assembly enacted legislation vesting operational control over the Charlotte Douglas International Airport in a newly created commission. The FAA treated the measure as necessitating the issuance of

12

a 14 C.F.R. Part 139 operating certificate and determined that the city would retain the certificate pending the resolution of the dispute and FAA review.

b. In 2014, the North Carolina General Assembly amended its 2013 Act to specify that it did not transfer ownership of the airport to a new entity and clarified that the newly appointed commission was not a new state entity but one authorized to exercise powers "on behalf of the city." *See* North Carolina Session Law, 2014-10. Section 11 of Session Law 2014-10 stated: "Nothing in this Article is intended to transfer the Airport or any Airport-related property away from the City. It is further intended that, following the enactment of this Article, the City, acting through the Commission, shall (i) continue to own and operate the Airport, (ii) continue to serve as sponsor of the Airport in connection with any grants given by the FAA, and (iii) refrain from taking any action that would impair the Commission's exercise of the powers granted to the Commission or that would impair the efficient operation and management of the Airport by the Commission," *id.* § 11. The FAA continued to treat the amended legislation as necessitating the issuance of a new airport operating certificate. The FAA did not permit the new Commission to operate under the City's certificate and did not issue an operating certificate to the commission.

c. In 2016, the Mississippi Legislature enacted legislation purporting to abolish the city-appointed Jackson Municipal Airport Authority and transfer the Jackson-Medgar Evers International Airport to a newly created authority with a state-appointed majority. *See* Miss. Code § 61-3-6. The legislation made the transfer effective only upon the FAA's approval of the new authority as an eligible airport sponsor and the FAA's issuance of a 14 C.F.R. Part 139 operating certificate. The

13

FAA has never granted that approval, and the transfer has never taken effect. This legislation has been the subject of active litigation since 2016, but the city-appointed authority continues to maintain operational responsibility for the airport.

40. The 2016 FAA Policy advises state legislative bodies considering whether to take action that would affect airport ownership, sponsorship, governance, or operations to consult with and obtain the consent of the current sponsor/operator.

41. The 2016 Policy states: "Consent from the current sponsor/operator before a change of sponsorship or operational authority is a critical factor for the FAA in determining whether safety, efficiency, and compliance with grant assurances as required by Federal law will be fully satisfied prior to, during, and after any transition period between sponsors/operators."

42. The 2016 Policy advises state legislative bodies considering whether to take an action that would affect airport ownership, sponsorship, governance, or operations to request technical assistance from the FAA about the interrelationship between Federal and state or local requirements.

43. The 2016 Policy states: "A failure to consult may cause FAA to deny a proposed change to airport sponsorship and/or operating authority."

44. On July 28, 2021, the FAA issued Compliance Guidance Letter 2021-1, Guidance for Transfer of Federally Obligated Airports (July, 28, 2021) ("Compliance Guidance Letter"). A copy of the Compliance Guidance Letter is attached as Exhibit 5.

45. The 2021 Compliance Guidance Letter states: "When a state or local government proposes a change in the governance of an airport, the existing sponsor, and proposed sponsor, must concur that the transfer is consistent with federal and state law to the satisfaction of the FAA.

14

46. Congress adopted Section 757 after attempted state takeovers of urban airports by the Georgia legislature in 2019 and the Tennessee legislature in 2023.

    a. In 2019, the Georgia Senate passed Senate Bill 131, which would have established a state authority to take control of Hartsfield-Jackson Atlanta International Airport from the City of Atlanta. The legislation's sponsor acknowledged that the legislative effort would require FAA approval. The measure failed, and no transfer occurred.

    b. In 2023, the Tennessee General Assembly adopted legislation to vacate and reconstitute the MNAA and take over the Nashville International Airport. After litigation by Metro Nashville against the 2023 Act had commenced, the FAA Associate Administrator sent MNAA and Metro Nashville a letter dated June 26, 2023. The FAA letter advised MNAA and Metro Nashville that it was "concerned about the uncertainty the legislation may have on the MNAA board governance during the pendency of the litigation" and that "the FAA will continue to recognize the existing Board" until the pending litigation was resolved. A copy of the FAA's June 26, 2023 letter is attached hereto as Exhibit 6.

47. A "disputed change in sponsorship" is defined in Section 757(d) as "any action that seeks to change the ownership, sponsorship, or governance of, or operational responsibility for, a federally obligated, publicly owned airport, including any such change directed by judicial action or State or local legislative action, where the airport sponsor of record initially does not consent to such change."

48. Section 757(b)(1) states that the FAA Administrator "shall not approve any disputed change of airport sponsorship" unless the Administrator receives one of the following: "(A) written

documentation from the airport sponsor of record consenting to the change in sponsorship or operation; (B) notice of a final, non-reviewable judicial decision requiring such change; or (C) notice of a legally-binding agreement between the parties involved."

49. The 2016 Policy had provided that the FAA would not act on a proposed change of airport sponsorship or operating authority until the dispute was definitively resolved to the satisfaction of the FAA, which could be demonstrated by issuance of a final, nonreviewable judicial decision, a consent letter between the existing airport sponsor and/or operator and the proposed new sponsor and/or operator, or by other legally definitive means deemed acceptable to the FAA.

50. Section 757(b)(1) does not authorize the FAA to rely on "other legally definitive means deemed acceptable to the FAA."

51. Further, Section 757(b)(2) states that the FAA Administrator "may not evaluate or approve a disputed change of airport sponsorship where a legal dispute is pending before a court of competent jurisdiction."

52. The 2021 Compliance Guidance Letter had provided that the FAA would refrain from evaluating a transfer request "until the legal dispute is resolved or the transfer's proponent demonstrates the transfer is consistent with federal and state law."

53. Section 757 does not include any provision permitting the FAA to evaluate a transfer request based on the transfer's proponent demonstrating the transfer is consistent with federal and state law.

54. Even after an agreement between the parties or a final judicial resolution, Section 757(c) requires the FAA Administrator to conduct an independent review to determine whether additional terms and conditions are necessary to ensure that "any change in the ownership,

16

sponsorship, or governance of, or operational responsibility for, a federally obligated, publicly owned airport is consistent with existing Federal law, regulations, existing grant assurances, and Federal land conveyance obligations."

55. Under Section 757(a)(1), the FAA "Administrator shall have the sole legal authority to approve any change in the sponsorship of, or operational responsibility for, the airport from the airport sponsor of record to another public or private entity." But pursuant to Section 757(b)(1), the Administrator cannot exercise this approval authority where there is a "disputed change of airport sponsorship."

56. The FAA Airport Compliance Manual provides guidance to FAA employees on implementation of the FAA's airport compliance program related to the responsibilities and obligations of airport sponsors.

57. The FAA released an updated Airport Compliance Manual effective February 20, 2026. *See* Fed. Aviation Admin., FAA Order 5190.6B, Airport Compliance Manual (effective Feb. 20, 2026), *available* *at* https://www.faa.gov/airports/resources/publications/orders/compliance_5190_6/order-5190-6c-compliance-complete. Part IV of the Airport Compliance Manual, relative to Airports and Aeronautical Users, includes Chapter 6, Rights and Powers and Good Title. A copy of Chapter 6 of the Airport Compliance Manual is attached hereto as Exhibit 7.

58. Chapter 6 of the Airport Compliance Manual describes the 2024 Reauthorization Act's requirements pursuant to Section 757.

59. Chapter 6 of the Airport Compliance Manual includes the eligibility criteria for airport sponsors, the FAA's review of a proposed sponsor's application, and a list of the documents required for FAA review and approval.

60. Recognizing that disputed changes of airport sponsorship can disrupt the FAA's mission, Section 757(b)(3) explicitly invites state legislative bodies considering legislation that would change an airport's ownership, sponsorship, governance, or operations to seek the FAA's technical assistance. Indeed, the FAA Administrator has the power to "deny a change in the ownership, sponsorship, or governance of, or operational responsibility for, a federally obligated, public airport" where a state does not seek technical assistance with respect to the change.

**IV. The State of Tennessee Passes 2023 Legislation to Take Over MNAA.**

61. In 2023, the Tennessee General Assembly adopted legislation to take over MNAA by vacating the MNAA board of commissioners and reconstituting it with an eight-member board with a majority of its members appointed by State Officer Defendants. *See* Tenn. Pub. Acts ch. 488, § 2.

62. In a state-court action Metro Nashville brought to challenge the 2023 Act, a three-judge trial panel held Section 2 of the 2023 Act unconstitutional and permanently enjoined Section 2 of the 2023 Act. *Metro. Gov't of Nashville & Davidson Cnty.*, No. 23-0778-II, Memorandum and Final Order (Davidson Cnty. Ch. Ct. Oct. 31, 2023).

63. On direct review, the Tennessee Court of Appeals affirmed and held Section 2 of the 2023 Act was unconstitutional, preserving the injunction against vacating the MNAA board of commissioners. *Metro. Gov't of Nashville & Davidson Cnty.*, No. M2023-01678-COA-R3-CV, 2025 WL 1218089 (Tenn. Ct. App. Apr. 28, 2025).

64. The State appealed the Court of Appeals decision to the Tennessee Supreme Court, and the case was argued on February 12, 2026. That case remains pending as of this filing.

**V. The State of Tennessee Passes 2026 Legislation to Take Over MNAA.**

18

65. In April 2026, the Tennessee legislature adopted 2026 Public Acts Chapter 978, which the Governor signed into law on May 19, 2026.

66. The 2026 Act amended the Metropolitan Airport Authority Act, including those portions of the 2023 Act that had been held unconstitutional and enjoined.

67. Section 1 of the Act vacates the MNAA board of commissioners on July 1, 2026. In so doing, the Act will remove all current commissioners, who were appointed by the Metro Nashville mayor and confirmed by the Metro Nashville council, from office and abridge their terms.

68. Section 1 creates a new nine-member board of commissioners that will be vested with legal authority over governance of the MNAA on July 1, 2026.

69. State Officer Defendants will appoint a majority of the new MNAA Board. The 2026 Act authorizes the Speaker of the State House of Representatives, the Speaker of the State Senate, and the Governor each to appoint two members to the MNAA board of commissioners. It authorizes Metro Nashville's Mayor to appoint three members to the board. Unlike the board vacated by the 2026 Act, any member of the new MNAA Board can be removed without cause or oversight by his or her respective appointing authority.

70. This is a State power grab. Where previously the MNAA was controlled by commissioners appointed by Metro Nashville and removable only for cause, the new Authority will be controlled by members appointed by the State of Tennessee who can be removed at any time without cause.

**IV.    Local Authorities Do Not Consent to the Changes Wrought by the 2026 Act.**

71.    Metro Nashville—the creating municipality of the MNAA—was never consulted by the Act's sponsors, other legislative leadership, or the State's executive branch about the 2026 Act.

72.    On May 19, 2026, the same day the Governor signed the Act, Metro Nashville's Metropolitan Council passed RS2026-1993, a resolution expressing "its strong opposition" to the Act and the State of Tennessee's attempted takeover of the MNAA (attached as <u>Exhibit 8</u>).

73.    On May 20, 2026, the MNAA unanimously passed a resolution expressing "its strong opposition" to the State's attempted takeover of the MNAA (attached as <u>Exhibit 9</u>).

74.    The 2026 Act's vacating of the Metro Nashville-appointed board and its enabling of a new form of airport authority board controlled by State Officer Defendants constitutes a disputed change in the sponsorship of the Airport.

75.    The 2026 Act also changes ownership of the MNAA. Because state officials will appoint a voting majority to the MNAA board and have unfettered dismissal powers, generally accepted accounting principles require that MNAA be considered a component unit of state government that must be reported on the State's financial statements rather than Metro Nashville's.

76.    Because the 2026 Act extinguishes Metro Nashville's appointment authority and oversight over MNAA and establishes a board controlled by the State Defendants, the 2026 Act implements a change in governance of the Nashville Airport Authority.

77.    By vacating the existing locally appointed MNAA board of commissioners and installing a new State Officer-controlled board on July 1, 2026, the 2026 Act effects a change in the operational responsibility for the Airport.

20

a. The 2026 Act specifies that the new State Officer-controlled board will serve as "the governing body" of MNAA. *See* 2026 Tenn. Pub. Acts, ch. 978, § 1b.

b. The Act's effective date provision specifies that the new State Officer-controlled board assume authority for the Airport on July 1, 2026. *Id.* § 7. The effective date provision reads in full: "For purposes of appointing commissioners to the new airport authority boards, this act takes effect upon becoming a law." For all other purposes, including the vacation and reconstitution of any board, this act takes effect July 1, 2026, the public welfare requiring it." *Id.*

78. On information and belief, the State never contacted the FAA for technical assistance as provided in Section 757(b)(3) before enacting the 2026 Act.

79. The Act's effective date does not condition the new board's assumption of operational responsibility for the Airport on the consent of the airport sponsor of record, a final judgment requiring the change, or a legally binding agreement between the parties.

**80.** The Act's effective date does not condition the new board's assumption of operational responsibility for the Airport on the FAA's review and approval of changes to the sponsorship, ownership, governance, or operational responsibility for the Airport.

81. The FAA Administrator has not undertaken an independent review of the 2026 Act's changes to the sponsorship, ownership, governance, or operational responsibility for the Airport. *See* Reauthorization Act § 757(c).

82. The FAA Administrator has not determined that the MNAA as reconstituted by the 2026 Act is able to satisfy Federal requirements for airport sponsorship or operation. *See id.*; *see also id.* § 757(a).

21

83.     None of Section 757(b)(1)'s prerequisites for administrative review have been met. The airport sponsor of record has not consented to the disputed change of airport sponsorship. No court has issued a final order requiring implementation of the disputed change of airport sponsorship. There is no legally binding agreement between the parties involved. *Id.* § 757(b)(1).

## CAUSES OF ACTION

**I.      Implied Right of Action Under § 757 of the Reauthorization Act.**

84.     Plaintiff adopts and incorporates all allegations in the preceding paragraphs as if fully set forth herein.

85.     Section 757 guarantees that Metro Nashville and MNAA's ownership, sponsorship, governance, and operational responsibility for the Nashville Airport cannot be altered or terminated without their consent, their agreement, or a judicial resolution of the dispute, followed by the review and approval of the FAA Administrator. Under Section 757, "disputed changes" in the ownership, sponsorship, governance, or operational responsibility for the Nashville Airport cannot be implemented without adhering to the statutory procedures safeguarding MNAA's and Metro Nashville's rights and interests.

86.     The 2026 Act implements a change in the ownership, sponsorship, governance, or operational responsibility for the Nashville Airport by State Officer Defendants on July 1, 2026. *See* 2026 Tenn. Pub. Acts, ch. 978, §§ 1, 7.

87.     Under Section 757, the FAA Administrator must conduct an independent review of "disputed changes" in the ownership, sponsorship, governance, or operational responsibility for the Nashville Airport prior to the new State Officer-controlled board's assumption of governance and operational responsibility for the Nashville Airport. *See* Reauthorization Act § 757(c).

22

88.    The FAA Administrator's independent review under Section 757(c) cannot lawfully commence while there is an unresolved "disputed change of sponsorship." *See id*. § 757(b). The FAA's review of the disputed changes under Section 757 is not permissible unless and until the Administrator is presented with (A) written consent of the sponsor of record; (B) a final, non-reviewable judicial decision requiring the change; or (C) notice of a legally binding agreement between the parties involved. *See id*. § 757(b)(1)(A–C).

89.    The airport sponsor of record did not consent to the disputed changes implemented by the 2026 Act. Both Metro Nashville and MNAA have adopted formal resolutions expressing their objection to the 2026 Act. There is no final, non-reviewable judicial decision requiring the changes implemented by the 2026 Act. There is no legally binding agreement between the parties involved in this dispute.

90.    By implementing and planning the implementation of the 2026 Act, State Officer Defendants are violating and planning to violate federal law to the detriment of Plaintiffs' rights under Section 757.

91.    Section 757 of the Reauthorization Act protects Metro Nashville and the MNAA from the State's vacating its board of commissioners and assuming governance, ownership, sponsorship, or operational responsibility for the airport until any disputed change is resolved and the FAA administrative process is completed.

92.    Congress's expressed intent under Section 757 was for state and local governmental entities to resolve "disputed changes" through judicial proceedings or by agreement before seeking the administrative approval necessary to implement changes to the ownership, sponsorship, governance, or operational responsibility for federally obligated, publicly-owned airports.

23

## II. Equitable Relief to Enjoin State Officials' Violation of Federal Law.

93. Plaintiffs adopt and incorporate all allegations in paragraphs 1 – 83 as if fully set forth herein.

94. A suit to enjoin state officials from acting in violation of federal law presents a federal question within this Court's jurisdiction. *See, e.g., Shaw v. Delta Air Lines, Inc.*, 463 U.S. 85, 96 n.14 (1983) ("It is beyond dispute that federal courts have jurisdiction over suits to enjoin state officials from interfering with federal rights.") (citation omitted); *Armstrong v. Exceptional Child Center, Inc.*, 575 U.S. 320, 327 (2015) ("The ability to sue to enjoin unconstitutional actions by state and federal officers is the creation of courts of equity, and reflects a long history of judicial review of illegal executive action, tracing back to England."); *see also id.* (citing *Osborn v. Bank of United States*, 9 Wheat. 738, 838–39, 844 (1824); *Ex Parte Young*, 209 U.S. 123, 150–51 (1908); *Davis v. Gray*, 16 Wall. 203, 220 (1873)).

95. Metro Nashville and MNAA will each suffer injuries by the implementation of the 2026 Act in violation of Section 757 of the FAA Act.

96. Section 757 of the 2024 FAA Reauthorization Act does not foreclose equitable relief. *See Armstrong*, 575 U.S. at 326–27.

97. Metro Nashville and MNAA seek only prospective, declaratory, and injunctive relief "against state officers who are violating, or planning to violate, federal law." *Id.*

98. The State Officer Defendants are each responsible for the implementation of the 2026 Act and effectuating the reconstitution of a new MNAA board that would assume governance and operational responsibility for the airport in violation of federal law on July 1, 2026.

24

## PRAYER FOR RELIEF

WHEREFORE, Metro Nashville and the MNAA demand judgment against Defendants Governor Bill Lee, Speaker of the Senate Randy McNally, and Speaker of the House Cameron Sexton in their official capacities, and prays that the Court award the following relief:

1.      A declaratory judgment that State Officer Defendants cannot implement the 2026 Act in any way until such time that all legal prerequisites of Section 757 of the FAA Reauthorization Act of 2024 have been satisfied.

2.      A temporary and permanent injunction preventing Defendants Governor Lee, Speaker McNally, and Speaker Sexton from implementing the 2026 Act in any way until such time that all requirements under Section 757 of the FAA Reauthorization Act of 2024 have been satisfied; and

3.      Such further and general relief as the Court deems appropriate at law or in equity.

Dated: June 10, 2026                    Respectfully submitted,

*/s/ Wallace W. Dietz*
DEPARTMENT OF LAW OF THE
METROPOLITAN GOVERNMENT OF
NASHVILLE AND DAVIDSON COUNTY
WALLACE W. DIETZ (#009949)
DIRECTOR OF LAW

Metropolitan Courthouse, Suite 108
P.O. Box 196300
Nashville, Tennessee 37219
(615) 862-6341
wally.dietz@nashville.gov


*/s/ Robert E. Cooper, Jr.*
BASS, BERRY & SIMS, PLC
ROBERT E. COOPER, JR. (#010934)
JEFFREY P. YARBRO (#024207)
WESLEY S. LOVE (#036860)
21 Platform Way South, Suite 3500

Nashville, Tennessee 37203
(615) 742-6200
bob.cooper@bassberry.com
jyarbro@bassberry.com
wesley.love@bassberry.com

*Counsel for Metro Nashville*

/s/ Phillip F. Cramer
SPERLING KENNY NACHWALTER LLC
PHILLIP F. CRAMER (#020697)
W. CAMPBELL HAYNES (#038055)
1221 Broadway, Suite 2140
Nashville, Tennessee 37203
pcramer@sperlingkenny.com
chaynes@sperlingkenny.com

*Counsel for Metropolitan Nashville Airport Authority*